UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | Case No. 1:05-CR-87 |
| v. | ) | Collier/Lee |
| | ) | |
| RICHARD STEPHENS | ) | |

REPORT AND RECOMMENDATION

**I. Introduction**

Defendant Richard Stephens ("Stephens") has filed a motion to suppress statements and evidence obtained by law enforcement on June 29, 2005 [Doc. No. 14]. The motion has been referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) [Doc. No. 19]. Stephens contends law enforcement officers conducted an illegal entry, search, and arrest in violation of the Fourth Amendment. For the reasons stated herein, it is **RECOMMENDED** Stephens' motion be **DENIED** in its entirety.

*Proceedings*

An evidentiary hearing on Stephens' motion to suppress was held on September 22, 2005. The government offered the testimony of Rhea County Detective Mike Bice ("Bice"), who was the sole witness to testify at the hearing.[1] Stephens subsequently filed supplemental post-hearing memoranda in support of his motion to suppress [Doc. Nos. 26, 27], including several exhibits not

_____

[1] Stephens' wife, Carolyn Stephens, testified at the suppression hearing on behalf of Stephens, but her testimony was stricken by agreement of the parties and has not been considered in this report and recommendation.

offered into evidence during the hearing [Doc. No. 28]. The government filed a reply to Stephens'

post-hearing pleadings [Doc. No. 30]. Subsequently, Stephens filed a notice of filing exhibits

supporting his motion to dismiss and motion to suppress [Doc. No. 31], eight exhibits [Doc. Nos.

36, 37], and a further response to the government's reply to his post-hearing memoranda [Doc. No.

38], which included a copy of the decision in *United States v. Coffelt, et al.*, No. 1:01-CR-158 (E.D.

Tenn. Dec. 20, 2001) [Doc. No. 38-2].

On October 12, 2005, a superseding indictment was returned by the grand jury charging

Stephens with additional violations of the law [Doc. No. 41]. Incident to Stephens' arraignment on

the superseding indictment, a modified discovery and scheduling order was issued providing new

deadlines for the exchange of discovery and the filing of motions [Doc. No. 44]. After receiving

"new" discovery, Stephens did not file any additional motions to suppress by the December 5, 2005

deadline [*id.* at 4], but he did file another memorandum, notice, and several photographs taken at

the scene of his arrest in support of his previously filed motion to suppress [Doc. Nos. 46, 47]. The

government then filed a response to Stephens' supplemental memorandum, including yet another

photograph [Doc. No. 51-1]. Neither party asked for an additional evidentiary hearing.

## II. Evidence

*Detective Mike Bice's Suppression Hearing Testimony*

Bice, a detective in the Rhea County Sheriff's Department, has been a law enforcement

officer for nearly 13 years and has been a narcotics officer for the past five and one-half years. Bice

has investigated over 100 marijuana cases.

A few weeks after federal agent Paris Gillette was shot by Terry Penny ("Penny") in Soddy-

Daisy in January 2004, Bice received a telephone call from Soddy-Daisy Police Detective Mike

2

Sneed ("Sneed"). Sneed told Bice that during the Penny investigation Sneed learned an individual named "Midget" was selling marijuana in Rhea County. At that time, Bice did not know the identity of Midget. A few weeks later, Bice spoke with a retired Rhea County narcotics officer, Clyde Henderson, who identified Stephens as "Midget" and gave Bice enough information for Bice to obtain Stephens' photograph and learn where he lived. After Stephens was identified as Midget, the Rhea County Sheriff's Department placed his home under surveillance for two days in 2004. The surveillance did not result in the observation of any criminal activity.

In the early afternoon of June 29, 2005, another officer in the Rhea County Sheriff's Department, Charlie Qualls ("Qualls"), went to Stephens' residence to serve Stephens with an order of protection issued by the Rhea County Circuit Court. Upon his return, Qualls told Bice he had spoken with Stephens' minor son, who told Qualls that Stephens had an indoor marijuana growing operation. Based upon this information, Bice, Qualls and Chief Deputy John Argo ("Argo") of the Rhea County Sheriff's Department decided to go to Stephens' residence to conduct a "knock and talk." They made no attempt to obtain a search warrant.

Around 4:00 p.m. that afternoon, the three officers drove to Stephens' residence in two vehicles. When they arrived at Stephens' residence there was a pick-up truck and another vehicle already parked in the driveway and the officers parked behind those vehicles. After Bice exited the patrol car, he detected the odor of marijuana as he passed the bed of the pick-up truck, which was covered.

Walking toward the front door of the residence, the officers passed the detached garage, which was located in front of the parked pick-up truck and to the right of the residence. As Bice walked past the garage on the walkway toward the house, he looked back and noticed a garage side

3

door was completely open. From his position on the walkway, Bice looked through the open side door of the garage and observed Stephens using a pair of scissors to cut the buds off of the stalk of a marijuana plant. There was an indoor light in the garage, which was flickering due to a ballast problem; however, Bice testified that from the walkway he observed Stephens trimming the buds off of a marijuana stalk.

Bice could not remember his exact words, but he told Qualls and Argo something to the effect of "Can you believe this?". Stephens did not notice Bice looking through the open door of the garage so Bice called "Hey Midget." In response to Bice's call, Stephens looked up, down, and then up again with an expression of surprise on his face. Stephens then jumped up and the officers, who had drawn their weapons, told Stephens to raise his hands. The officers entered the garage to seize Stephens who immediately dropped the marijuana plant, but did not realize the scissors were still in his hand. Bice told Stephens to drop the scissors and Stephens quickly shook his hand and the scissors fell to the floor of the garage.

Bice approached Stephens, told him to get down on the ground and handcuffed Stephens. On direct examination, Bice testified Stephens was returned to the chair in which he had been sitting when Bice saw him through the open garage door after he was handcuffed, and Bice asked Stephens for consent to search his property. On cross examination, Bice indicated the initial request for consent was made while Stephens was still on the ground in handcuffs. In response to Bice's request for consent to search, Stephens said he had been caught "red-handed" or words to that effect. One of the law enforcement officers retrieved the standard consent to search form used by the Rhea County Sheriff's Department from a patrol car and Bice read the consent form to Stephens while he was sitting in the chair. After the form was read to him, Stephens indicated he understood and

4

would sign the consent form. Qualls removed the handcuffs and Stephens signed the consent form. After he signed the consent form, *Miranda* warnings were given to Stephens and he indicated he understood his rights. Bice called for back-up to assist in the search and several other officers arrived as requested. Once the consent form had been signed, the residence, garage, and the pick-up truck were searched. On cross examination, Bice agreed the garage was within the curtilage of Stephens' residence.

When Stephens signed the consent form, the date and Stephens' name and address were filled in on the "blank" portions of the form. After the back-up officers arrived, Bice added the names of the officers who participated in the search to the executed consent form.

### III. Law and Analysis

Stephens argues for the suppression of "physical evidence and statements" because:

> any firearms or other allegedly inculpatory evidence found and seized inside his home were the result of a warrantless entry and search in violation of the Fourth Amendment. To the extent the government asserts any exceptions to the warrant requirement, movant submits the same were not in plain view, nor were [sic] was his home searched incident to a lawful arrest, nor was there any valid consent or other attributed waiver or [sic] rights on his part. To the extent any paper was signed by defendant, such was involuntary, the result of coercion, or alternately the result of acquiescence.

[Doc. No. 14 at 1]. Stephens' motion to suppress depends in large part on his argument that Bice's testimony is not credible, so I will address the credibility issue first.

*Credibility*

Stephens has repeatedly attacked the credibility of Bice. The crux of Bice's testimony at the suppression hearing concerned his plain view observation and the circumstances under which Stephens gave consent to search. Stephens argues the alleged inconsistencies and contradictions of

Bice's testimony about events when viewed individually "might not seem that important" but when viewed collectively, "they cast material doubt on the reliability" of Bice's testimony [Doc. No. 27 at 13]. When considering Stephens' credibility arguments either separately or together, however, I find the evidence does support Bice's testimony concerning his plain view observation of Stephens engaged in a felony and the circumstances of Stephens' consent. Stephens has not demonstrated Bice's testimony was fabricated, mistaken, or so inconsistent as to render it unpersuasive or untrustworthy. When viewing all of the credibility arguments collectively, the sum of Stephens' tenuous credibility arguments is no greater than its parts.

Stephens contends Bice's credibility should be discounted because no document acknowledging Stephens waived his rights after being given *Miranda* warnings appears in the record [Doc. No. 27 at 10-11]. Stephens states he "still maintains that he was not advised of his *Miranda* rights," and his credibility argument about the lack of a waiver "should not be treated as any abandonment of that position." [*Id.* at 9 n.2]. Stephens argues in the absence of a signed acknowledgment of *Miranda* warnings and waiver of rights, Bice's testimony he orally gave *Miranda* warnings to Stephens and Stephens waived his constitutional rights should not be considered plausible [*id.* at 11]. Other than pointing out that no signed form acknowledging he was given *Miranda* warnings appears in the record, Stephens has presented no evidence to support his claim he was not given *Miranda* warnings. Under these circumstances, the mere lack of a signed waiver does not support finding Bice's testimony lacks credibility.

Bice has consistently testified *Miranda* warnings were given to Stephens, but Bice has inconsistently testified about when the *Miranda* warnings were given. During the suppression hearing, Bice testified on direct examination that *Miranda* warnings were given to Stephens after

he signed the consent to search form. On cross examination, Bice testified *Miranda* warnings were given to Stephens, but he could not recall if they were given before or after Stephens signed the consent form. At the July 29, 2005 detention hearing, Bice testified *Miranda* warnings were given to Stephens before he signed the consent form [Doc. No. 20 at 16]. Bice's inconsistent testimony with respect to the timing of the *Miranda* warning does not cause me to conclude Bice has presented false testimony that the *Miranda* warnings were given. Instead, I conclude *Miranda* warnings were given to Stephens, but the government has not established the *Miranda* warnings were given prior to Stephens' consent to search.

Stephens also claims Bice's detention hearing testimony that he found marijuana residue on the scissors seized from the garage and in the bedroom closet in Stephens' residence is a basis for finding Bice's testimony lacks credibility [Doc. No. 27 at 11-12]. According to Stephens, it "turned out that 'residue' on the scissors was resin from the marijuana plant stalks, while the 'residue' in the closet was particles of dried green flakes in the carpet not unlike dried oregano in appearance."[*id.*]. At the detention hearing, Bice testified that during the search of Stephens' residence, marijuana residue was found on the floor of Stephens' bedroom [Doc. No. 20 at 31]. Bice also testified this residue was "just green plant material lying in the floor" of "the bedroom closet." [*id.* at 32]. Bice did not take a sample of the substance and did not test it, instead he identified it visually based upon his experience [*id.* at 33-34]. Stephens contends no sample or photograph of the residue in the bedroom closest was taken by law enforcement officers because there really was no marijuana residue in the bedroom. Specifically, Stephens argues:

> while there are 70 photographs of just about everything which could
> conceivably be related to narcotics on the premises (including holes
> dug in the yard, the floor of the garage, marijuana debris on a truck
> bumper, and even two shell casings depicted in dirt in proximity to

7

remnants of a marijuana plant), there is no photograph, there is no diagram, there is no visual record of any kind depicting the so-called "marijuana residue" Detective Bice now claims was present in defendant's bedroom closet where his guns were kept. Where officers on the scene photographed practically anything and everything they perceived to be relevant to their investigation and arrest of the defendant -that what is supposedly now such a key piece of evidence was not preserved **in any form** makes all of Detective Bice's testimony highly suspect.

[Doc. No. 46 at 1-2] (emphasis in original and internal citations omitted). I am not convinced "all of" Bice's testimony is "highly suspect" [*id.*] simply because the record contains no sample or photograph of the alleged residue in the bedroom, especially where no evidence was presented to contradict Bice's testimony that a substance he believed to be marijuana residue was found in the bedroom.

Next, Stephens argues Bice's suppression hearing testimony is not credible based upon certain allegedly material omissions from Bice's grand jury testimony and his conduct in reviewing the transcript of his grand jury testimony during the suppression hearing [Doc. No. 27 at 12-14]. During the suppression hearing and without objection by the government, Stephens was granted a short recess so Bice could read the transcript of his grand jury testimony pursuant to Fed. R. Crim P. 26.2.[2] During his grand jury testimony, Bice testified he had been working narcotics for the past seven years [Doc. No. 35 at 2]. On direct examination during the suppression hearing, Bice said he had been a narcotics officer with the Rhea County Sheriff's Department for the past five and a half years. On cross examination, Bice testified he left the Rhea County Sheriff's Department for a period of time and later returned to the department to work in narcotics. Bice also testified he had

_____

[2] The transcript of Bice's grand jury testimony was not made an exhibit during the suppression hearing, but it was filed as Exhibit B to Stephens' First Motion in *Limine* [Doc. No. 35].

been working in law enforcement in narcotics for seven years, some of it under the direction of former Rhea County narcotics detective B.J. Johnson ("Johnson").  However, Bice stated he had been working in the narcotics area for about five years by himself (*i.e.*, not under the supervision of Johnson).  I conclude Bice's testimony to the grand jury and at the suppression hearing about his experience working in narcotics is not inconsistent but, even assuming *arguendo* the testimony is inconsistent, the inconsistency is so minor it does not warrant finding Bice's suppression hearing testimony is not credible.

Stephens further contends Bice's testimony lacks credibility because Bice was trained to do his current job by Johnson.  One of the two exhibits submitted by Stephens in support of his post-hearing memoranda is a letter from Jerry Estes ("Estes"), District Attorney General for the 10th (Tennessee) Judicial District, to Sheriff Steve Frisbee [Doc. No. 28, Exhibit 2].  In his letter, Estes makes certain statements about Johnson's credibility [*id*].  Even if the letter were properly before the Court, the mere fact Johnson had some involvement in training Bice years prior to the events at issue, does not support finding Bice's testimony lacks credibility.

Stephens also argues "Bice . . . represented to the Court during the suppression hearing that he had 'read' all of his grand jury testimony so he could be effectively cross examined concerning the same" but cross examination showed he had only "skimmed over" the transcript [Doc. No. 27 at 6].  Although I agree Bice should have read the transcript in full when given the opportunity to do so, Bice did not misrepresent he had read the transcript word-for-word.  In addition, a copy of the transcript was available at the suppression hearing and Stephens' counsel was not prevented from fully examining Bice about any alleged inconsistencies in his testimony even though Bice only "skimmed over" the transcript.  That Bice did not really "read" his grand jury testimony

9

word-for-word during the suppression hearing does not support Stephens' argument that Bice must not have read the consent form to Stephens [Doc. No. 27 at 7].

Stephens also complains about certain statements Bice allegedly made to the local news media about Stephens' arrest [Doc. No. 27 at 8]. Except for the inconsistency about whether *Miranda* warnings were given before or after Stephens signed the consent form discussed *infra*, there is little to no inconsistency between Bice's testimony at the suppression hearing and the account of Stephens' arrest in the newspaper article. Officer Jamie Gravitte is named in the newspaper article as having responded to and assisted in the search at Stephens' residence, but is not listed on the consent form [Doc. No. 25, government's exhibit 2 and Stephens' exhibit 3]. However, even assuming *arguendo* this inconsistency can be attributed to Bice on the basis of a newspaper article, the alleged inconsistency is again so immaterial it does not form a basis for concluding Bice's testimony lacks credibility.

In attacking Bice's credibility, Stephens focuses on certain photographs taken of the scene of the arrest[3] and sets forth his interpretation of the photographs in detail [Doc. No. 47 at 2-3]. Stephens contends the photographs show Bice's testimony about observing Stephens cutting the buds off of the stalk of a marijuana plant in plain view "are just not supported by the physical evidence at the scene" and contends the photographs show "there's no way Bice could have seen what he claims to have seen." [Doc. No. 46 at 4] In response, the government also submitted a photograph, which it states was taken on the day at issue and shows the view from the walkway

---

[3] In his supplemental memorandum in support of his motion to suppress [Doc. No. 47], Stephens refers to these photographs as Exhibits B-1, B-2(a), B-2(b) and B-3. In the record, these photographs appear as: Exhibit B-1 – [Doc. No. 47, Attachment #10]; Exhibit B-2(a) – [Doc. No. 47, Attachment #11]; Exhibit B-2(b) – [Doc. No. 47, Attachment #12]; and Exhibit B-3 – [Doc. No. 47, Attachment # 13].

outside Stephens' garage looking through the open side door of the garage [Doc. No. 51-1 at n.1]. The government argues: "[all] of the photographs, documentary evidence, and physical evidence supports Detective Bice's recollection of events." [Doc. No. 51-1 at 1].

In the interests of judicial economy and a full and fair consideration of the issues, I have reviewed all of the photographs submitted by the parties, placing particular emphasis on the photographs primarily relied on by Stephens and the single photograph submitted by the government. Having reviewed the pleadings and photographs, I conclude the evidence does not support Stephens' contention that Bice's testimony is not credible. In particular, the photographs are not sufficient to show Bice has falsified or is mistaken about his observation of Stephens in plain view through the open side door of the garage removing the buds from a marijuana plant. The photographs do not demonstrate that Bice could not have seen Stephens from the walkway engaged in a felony in the garage. In contrast to speculation based on photographs taken after the arrest about the placement of scissors, chairs, bags, plants, and containers at the time of the plain view observation, Bice testified, without equivocation or hesitation, that he observed, from the walkway and in plain view, Stephens committing a felony. The photographs neither demonstrate Bice's testimony is false nor do they undermine Bice's credibility.

Having found Bice's testimony concerning his plain view observation and the circumstances under which Stephens gave consent to search to be credible as set forth above, I will address the legal arguments made by Stephens in support of suppression.

*Warrantless Entry and Plain View*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

11

no Warrants shall issue, but upon probable cause, supported by Oath or affirmation...." U.S. Const. amend. IV. "It is well-established that a defendant claiming that a search violated his Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched." *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001) (citing *United States v. Sangineto-Miranda,* 859 F.2d 1501, 1510 (6th Cir.1988)).

The law permits officers to engage in consensual encounters with suspects without violating the Fourth Amendment. *See, e.g., Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir.2005) ("A purely consensual encounter between a police officer and a citizen does not implicate the Fourth Amendment."); *United States v. Waldon,* 206 F.3d 597, 602 (6th Cir.2000) ("[T]he consensual encounter may be initiated without any objective level of suspicion."). The Sixth Circuit recently reiterated:

> Consensual encounters do not lose their propriety, moreover, merely because they take place at the entrance of a citizen's home. A number of courts, including this one, have recognized "knock and talk" consensual encounters as a legitimate investigative technique at the home of a suspect or an individual with information about an investigation. *See, e.g., United States v. Chambers,* 395 F.3d 563, 568 n. 2 (6th Cir.2005) ("Courts generally have upheld [the knock and talk] investigative procedure as a legitimate effort to obtain a suspect's consent to search."); *Ewolski v. City of Brunswick,* 287 F.3d 492, 504-05 (6th Cir.2002) (concluding that it was reasonable to approach a suspect's home to attempt to learn more through consensual questioning); *Nash v. United States*, 117 Fed. Appx. 992, 2004 WL 2912796, at *1 (6th Cir. Dec.16, 2004) (noting that this court has "explicitly upheld the legitimacy of doorstep investigatory interviews"); *United States v. Jones,* 239 F.3d 716, 720 (5th Cir.2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."); *United States v. Cormier,* 220 F.3d 1103, 1109 (9th Cir.2000) (holding that "no suspicion needed to be shown in order to justify the 'knock and talk'"); *United States v. Jerez,* 108 F.3d 684, 691-92 (7th Cir.1997) (recognizing that a knock and talk

12

is ordinarily consensual unless coercive circumstances exist); *United States v. Titemore,* 335 F. Supp. 2d 502, 505 (D. Vt. 2004) ("Under the rule permitting knock and talk visits, no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors.") (quotation omitted).

*United States v. Thomas***,** --- F.3d ---, 2005 Fed. Appx. 460, 2005 WL 3209248, at *2 (6th Cir.(Tenn.) Dec. 1, 2005).

Bice testified officers arrived at Stephens' residence to conduct a knock and talk after receiving information from Stephens' minor son indicating Stephens had an indoor marijuana growing operation. Upon exiting his vehicle, Bice detected the odor of marijuana, which grew stronger as he neared the pick-up truck parked in the driveway. Bice continued walking toward the front door of the residence and from the walkway noticed the side door of the garage was completely open. From his position on the walkway, Bice was able to look through the open side door of the garage and observe Stephens using a pair of scissors to cut the buds off of a marijuana plant. Bice acknowledged the interior light in the garage was flickering, but unequivocally testified he observed Stephens engaged in criminal activity through the open side door of the garage.

The knock and talk strategy is reasonable when officers seek to gain an occupant's consent to search as occurred in this case. *See Chambers*, 395 F.3d at 573. When conducting a knock and talk, "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors -- such as driveways, walkways, or similar passageways." *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984); *accord Thomas***,** --- F.3d ---, 2005 WL 3209248, at *2. When conducting a knock and talk, there is no requirement the police wear blinders from the time they arrive on the property until they arrive at the door of a residence. "[T]he police cannot reasonably be expected to avert their eyes from

13

evidence of criminal activity that could have been observed by any member of the public. Hence, 'what a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.'" *California v. Greenwood*, 486 U.S. 35, 42 (1988) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)).

The Supreme Court has "described the curtilage of a dwelling as 'the area to which extends the intimate activity associated with the "sanctity of a man's home and the privacies of life.'" *Dow Chemical Co. v. United States*, 476 U.S. 227, 236 (1986) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). The Sixth Circuit recently again held the Fourth Amendment does not absolutely bar all government encroachment upon curtilage. *Widgren v. Maple Grove Township*, --- F.3d ---, 2005 Fed. Appx. 445, 2005 WL 3068197, (6th Cir. (Mich.) Nov. 17, 2005) (citing *California v. Ciraolo,* 476 U.S. 207, 213(1986)). While the Fourth Amendment clearly protects a person's abode from unfettered access by the police, law enforcement is not, in all circumstances, prohibited from entering onto the curtilage and walking up to a person's door in order to knock and ask to speak to the residents. *See e.g., United States v. Smith*, 783 F.2d 648, 651 (6th Cir. 1986) ("Whether a driveway is protected from entry by police officers depends on the circumstances. The fact that a driveway is within the curtilage of a house is not determinative if its accessibility and visibility from a public highway rule out any reasonable expectation of privacy"); *accord United States v. Humphries,* 636 F.2d 1172, 1179 (9th Cir.1980), *cert. denied,* 451 U.S. 988 (1981) (where automobile was visible from the street and the driveway was not enclosed in any way, officer's entry onto driveway to obtain automobile's tag number did not violate any reasonably held expectation of privacy).

I find Bice observed Stephens engaged in criminal activity in plain view while Bice was

conducting a legitimate knock and talk and while in areas of Stephens' property – the driveway and the walkway leading to the front door of the residence – where Stephens had no legitimate expectation of privacy under the Fourth Amendment.  *Id.*; *see also United States v. Ventling*, 678 F.2d 63, 66 (8th Cir. 1982) (no legitimate privacy expectation in residential driveway accessible to and from public highway).  When a felony occurs in plain view of police officers, the officers are entitled to seize evidence of the crime and the person committing the crime.  Police officers may seize evidence or a person if (1) the officers are lawfully at the place where they see a crime or incriminating evidence; (2) the crime or the evidence is in plain view from that vantage point; and (3) it is obvious that a crime is occurring or the nature of the incriminating evidence is readily apparent.  *Horton v. California*, 496 U.S. 128, 137-138 (1990).  Bice observed Stephens engaged in activity related to the manufacture of marijuana in plain view through the open garage door and immediately recognized the illegality of Stephens' actions and the presence of marijuana.  Accordingly, I conclude Stephens and evidence of the illegal manufacture of marijuana were in plain view.  Once Bice observed Stephens and evidence of the illegal manufacture of marijuana in plain view, Bice and the other officers were entitled to seize the contraband and Stephens.[4]

Stephens suggests the officers were not lawfully at the place where they could see him committing a crime because he has a protected privacy interest in his garage and/or walkway, which

_____

[4] The police were also entitled to seize Stephens and the evidence of the illegal manufacture of marijuana to prevent the destruction of evidence.  When Bice observed Stephens through the open side door of the garage, Stephens saw Bice and was on notice law enforcement officers had observed him conducting a felony.  If the law enforcement officers had left the scene to obtain a warrant, it was reasonably foreseeable Stephens would have had an opportunity to destroy evidence of his crime in their absence.  When officers reasonably believe there is a risk of imminent destruction of evidence, exigent circumstances exist which excuse those officers from first seeking a warrant before commencing a search.  *See Schmerber v. California*, 384 U.S. 757, 770-771 (1966); *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994).

15

is within the curtilage of his home [Doc. No. 27 at 1-2]. The government concedes the garage was within the curtilage of Stephens' residence [Doc. No. 30 at 4], but that concession does not result in suppression. I conclude Stephens had no legitimate expectation of privacy either in the driveway or walkway leading to the front door of his home even though they were within the curtilage of his residence. No evidence was presented that accessibility or visibility of the driveway from the public highway was limited in any way. No evidence was presented that there were any "No Trespassing" signs or that the officers had to pass through a gate or fence to walk from the driveway to the front door of Stephens' residence. After exiting his vehicle and noticing a strong odor of marijuana, Bice walked down the driveway and onto the walkway leading to the front door of Stephens' residence. From the vantage point of the walkway, Bice observed Stephens cutting buds from the stalk of a marijuana plant through the completely open side door of the garage. Despite detecting the strong odor of marijuana, Bice and the other law enforcement officers did not remove the cover from the pick-up truck parked in the driveway or open the side door to the garage. Stephens' curtilage argument fails because it was not until Bice observed Stephens engaged in a felony in plain view that officers entered the garage and Stephens was taken into custody.

Accordingly, I find the government submitted credible testimony, not refuted on cross examination, that law enforcement officers saw Stephens in plain view engaged in illegal activity. Stephens, as the proponent of the motion to suppress, failed to meet his burden of establishing his Fourth Amendment rights were violated. *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

*Stephens' Consent to Search*

The Supreme Court has long recognized that "a man's home is his castle" and, specifically, that a right to be secure in one's home from intrusion is embodied by the Fourth Amendment.

16

*Minnesota v. Carter,* 525 U.S. 83, 94 (1998) (Scalia, J., concurring) (emphasis omitted); *see United States v. Nelson,* 459 F.2d 884, 885 (6th Cir.1972) (noting that the Fourth Amendment exists to ensure the inviolability of an individual's home). The Fourth Amendment prohibits searches without a warrant except in limited circumstances, such as when a search is conducted with consent. *See Florida v. Royer,* 460 U.S. 491, 497 (1983); *see also United States v. Riascos-Suarez,* 73 F.3d 616, 625 (6th Cir.1996) (search may be conducted without a warrant if free and voluntary consent is given (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)).

The parties agree Stephens signed a consent to search form but dispute the circumstances under which the form was signed. The determination of "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all of the circumstances." *Schneckloth*, 412 U.S. at 227. Where the legality of the search turns on the validity of the consent, the Sixth Circuit has summarized the appropriate analysis for determining the validity of the consent to search as follows:

> A court will determine whether consent is free and voluntary by examining the totality of the circumstances. It is the Government's burden, by a preponderance of the evidence, to show through "clear and positive testimony" that valid consent was obtained. Several factors should be examined to determine whether consent is valid, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; whether the individual understands his or her constitutional rights; the length and nature of detention; and the use of coercive or punishing conduct by the police.

*Riascos-Suarez,* 73 F.3d at 625 (quoting *United States v. Scott,* 578 F.2d 1186, 1188 (6th Cir.1978)). Consent can be voided by duress, coercion, or trickery. *See United States v. Buchanan,* 904 F.2d 349, 355 (6th Cir.1990).

Stephens contends his consent to search his residence was not knowing and voluntary because he:

> was not given the opportunity to actually read the Consent to Search
> form. He was kept face down on the floor, with his hands cuffed
> behind his back as the form was supposedly read to him. The cuffs
> were taken off one hand and he was allowed to raise up from the
> floor only for the purpose of signing the form. Defendant was only
> uncuffed long enough to make his signature. He was immediately re-
> hand cuffed and only then allowed to get up off the floor to sit in a
> chair after he signed the form.

[Doc. No. 27 at 7-8]. Stephens contends the word "premises" in the consent form is not broad enough to cover his residence.

Stephens also argues "the consent to search form had not even been filled out when presented to Mr. Stephens to sign. Detective Bice testified that the form was presented to Mr. Stephens in blank, and then only filled out after Stephens had signed the paper . . . ." [Doc. No. 27 at 8]. More precisely, Bice actually testified he had filled in only the date and Stephens' name and address at the time Stephens signed the consent form and Bice wrote the names of the officers who participated in the search on the executed consent form later.

The consent form states in relevant part:

> I, *Richard A Stephens* having been informed of my constitutional
> right not to have a search made of my premises, hereinafter
> mentioned without a search warrant and of my right to refuse to
> consent to such a search, hereby waive this right and authorize . . . to
> conduct a complete search of my premises located at *285 Edward
> Johnson Lane Dayton TN 37321.*
>
> These agents of the Rhea County Sheriff's Department are authorized
> by me to take from my premises any letters, papers, materials, or
> other property which they may desire.
>
> This written permission is being given by me to the above named
> deputies of the Rhea County Sheriff's Department voluntarily and
> without threats or promises of any kind.

18

[Doc. No. 25, Government's Exhibit 2].[5]  Contrary to Stephens' argument, I find the consent form's use of the word "premises" clearly includes Stephens' residence at 285 Edward Johnson Lane.

Stephens' contentions about the circumstances surrounding his consent are not completely consistent with the evidence presented at the suppression hearing.  Bice testified Stephens was initially placed on the ground and handcuffed.  While Stephens may have been asked for consent to search while he was on the ground, Bice's testimony indicates Stephens had been returned to a chair before Stephens signed the consent form.  On cross examination, Bice was asked if, while on the floor, Stephens was uncuffed long enough to be given an opportunity to sign the consent form. Bice replied Stephens was sitting in the chair when the consent form was signed.

The testimony establishes the consent form, which includes notice about the right to refuse a search without a warrant, was read to Stephens prior to any search.  Thus, I find Stephens was informed of his right to refuse a search of his premises,  and that he voluntarily gave consent to a search without a warrant.  As noted during Stephens' July 29, 2005 detention hearing [Doc. No. 20 at 69], Stephens has several prior arrests and convictions, indicating he is acquainted with the criminal justice system.  There was no proof submitted indicating Stephens was unaware of his right to refuse to give his consent to the search.  I conclude the addition of names of officers participating in the search to the form after its execution by Stephens, while perhaps not the best practice, does not render the consent uninformed or involuntary. That the form was read to Stephens instead of by Stephens, who apparently did not have his reading glasses with him, also does not render Stephens' consent involuntary or unknowing under the circumstances.

Given the totality of the circumstances, the government has satisfied its burden of showing

---

[5]  Portions quoted in italics are the handwritten additions to the pre-printed form.

consent to search was given freely and voluntarily by Stephens. Bice read the consent form to Stephens, Stephens indicated he understood and was willing to consent, the handcuffs were removed from Stephens' right hand so he could sign the consent form, and Stephens signed the form. There is no evidence of any coercion, threat or promise made to procure Stephens' consent and there is no evidence Stephens suffered from any mental deficiency which rendered him incapable of making a free choice regarding consent. *Id.* (citing *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995).

As mentioned above, testimony as to the timing of the *Miranda* warnings is inconsistent as to whether Stephens was informed of his *Miranda* rights before or after Stephens signed the consent form. Even assuming the *Miranda* warnings were given to Stephens after he signed the consent to search form, however, I conclude Stephens' consent to search was knowing and voluntary under the totality of the circumstances. *See United States v. Cole*, 51 Fed. Appx. 944, 945 (6th Cir. Nov. 22, 2002). Like the instant situation, the defendant in *Cole* did not receive *Miranda* warnings until after he signed a consent to search form. *Id.* Nevertheless, the Sixth Circuit affirmed the district court's finding that under the totality of the circumstances the consent to search was knowing and voluntary. *Id.* at 945-46; *see also United States v. Strache*, 202 F.3d 980, 986 (7th Cir. 2000) (consent voluntary where Strache had been handcuffed, in custody for approximately 20 minutes, and had not been given *Miranda* warnings prior to giving his consent to search the apartment because the police "asked only once before Strache consented to the search..." and although he was handcuffed, "...the police did not badger him for information or consent, nor physically abuse or pressure him.").

Stephens' consent is not invalidated because he was in custody at the time he gave consent. *United States v. Burns*, 298 F.3d 523, 541 (6th Cir.), *cert. denied*, 538 U.S. 953 (2003) (defendant's

consent not invalidated merely because he was handcuffed and in custody at the time he gave it);

*United States v. Blakeney,* 942 F.2d 1001, 1016 (6th Cir.1991) ("The fact of custody alone is not

enough to demonstrate that the consent was coerced." (citing *United States v. Watson,* 423 U.S. 411,

424 (1976)). Even if Bice stated an intent to obtain a search warrant if Stephens declined to provide

his consent, such statements do not vitiate consent. *United States v. Blanco,* 844 F.2d 344, 351 (6th

Cir. 1988) (upholding finding of voluntariness even though the investigating agent informed the

suspect that if he refused to sign a consent to search form, the agent would attempt to secure a search

warrant). As noted above, Stephens is familiar with the criminal justice system and Stephens was

advised of his constitutional right to refuse consent to search. There is no evidence Stephens was

subject to any threats, coercion or repeated requests for consent. There is no evidence Stephens

attempted to revoke his consent after being given *Miranda* warnings or before the search of his

home commenced. Considering the foregoing, I find Stephens' consent was voluntary and freely

given.

In his post-hearing memoranda, Stephens has raised certain arguments relying upon "facts"

not presented as evidence at the suppression hearing. For instance, Stephens has made allegations

about his medical history; his receipt of Social Security disability payments; his custody

arrangements concerning his minor son; and the order of protection served on June 29, 2005 [Doc.

No. 26 at 1-4]. Stephens asserts: in 1984 he was buried alive in a ditch resulting in serious back

injuries and the breaking of almost all of the bones on the left side of his body; he has been in

several car wrecks, including an incident in 2001 where he reinjured his spine; and he developed

throat cancer in 2004, which resulted in two surgeries in the same month [Doc. No. 26 at 1-2]. Even

considering the arguments that Stephens suffers or did suffer from several serious physical ailments,

Stephens has presented no evidence that his alleged ailments or the medications he might take for those ailments impaired his capacity to consent to the search at issue.

The unreported decision issued by the Honorable R. Allan Edgar in *Coffelt* relied upon by Stephens, is distinguishable from this situation. During a search for an escaped fugitive, Rhonda Coffelt gave consent to an officer for her house to be searched. No. 1:01-CR-158, [Doc. No. 38-2], at 2-3. Permission to enter, but not search, was also given to a separate officer by another defendant, Melissa Griffith, who was described as "pretty much hysterical." *Id.* at 4. Under the totality of the circumstances in *Coffelt*, the Court found the consent to search was not freely, voluntarily and knowingly given because Griffith was not told the officer wished to search the house, and because Coffelt was not in "the most alert state of mind" due to her alcohol and drug use. *Id.* at 5. The Court concluded the government had not proven consent was uncontaminated by duress or coercion. *Id.* In contrast, Stephens presented no evidence during the suppression hearing that he was under the influence of drugs, had been drinking, was hysterical, or was in any way impaired at the time he gave consent to search. As discussed above, while Stephens has alleged several physical ailments, he has not presented any evidence that either the ailments or any medications he might take as a result of the ailments would affect his ability to knowingly and voluntarily consent. Thus, the decision in *Coffelt* does not support suppression in this case.

Accordingly, I find the government has submitted credible testimony, not refuted on cross examination, that Stephens voluntarily and knowingly gave a valid consent to search.

*Stephens' Statement*

Stephens also seeks to suppress statements allegedly attributed to him because:

> Government witnesses and officers have attributed certain
> incriminating statements to the defendant while in custody, under

arrest, and without having a lawyer present. Defendant denies that he was advised of his rights, that he said what has purportedly been attributed to him, or that officers possess any waiver of rights made by him. Defendant contends no such waiver was present in any consent he was coerced to sign, or which he signed out of acquiescence. **Defendant very much maintains that he did not tell anyone he'd sold "tons" of marijuana."**

[Doc. No. 14 at 2] (emphasis added). In spite of Stephens' argument, no evidence was submitted at the hearing about statements attributed to Stephens concerning the sale of "tons" of marijuana which might be subject to suppression. However, Bice did testify Stephens said words to the effect of being caught red-handed when asked for permission to search. Assuming the red-handed statement is the one Stephens seeks to suppress, I conclude this statement should not be suppressed.

Where law enforcement officers interrogate a suspect in custody before informing him of his rights to remain silent and to have the presence and assistance of retained or appointed counsel during any custodial interrogation, "*Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the [government's] case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317 (1985). "Custodial interrogation" has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

Stephens was in custody at the time of the red-handed statement. *See Mason v. Mitchell*, 320 F.3d 604, 631 (6th Cir. 2003) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). And, the government has not shown Stephens had been informed of his *Miranda* rights at the time he was asked for permission to search and made the red-handed statement. I find, however, Stephens was not subject to interrogation at the time he made the statement. "Interrogation" includes both express

questioning and its functional equivalent, which includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). When Bice asked Stephens if he would consent to a search, he could not have known it would be likely to elicit an incriminating response from Stephens such as "you've caught me red-handed." Rather, Bice would have reasonably anticipated the question would elicit either a "yes" or "no" response. "[R]equesting consent to search is not likely to elicit an incriminating statement" and is not interrogation which requires *Miranda* warnings. *United States v. LaGrone*, 43 F.3d 332, 335 (7th Cir. 1994) (citing *United States v. Rodriguez-Garcia*, 983 F.2d 1563 (10th Cir. 1993); *United States v. Lewis*, 921 F.2d 1294 (D.C. Cir. 1990); *Cody v. Solem*, 755 F.2d 1323 (8th Cir.), *cert. denied*, 474 U.S. 833 (1985); *Smith v. Wainwright*, 581 F.2d 1149 (5th Cir. 1978); *United States v. Lemon*, 550 F.2d 467 (9th Cir. 1977); *United States v. Faruolo*, 506 F.2d 490 (2d Cir. 1974)). Therefore, I conclude there are no grounds to suppress Stephens' unanticipated statement about being caught red-handed when asked for consent to search.

24

## IV. Conclusion

For the reasons stated herein, it is **RECOMMENDED** that Stephens' motion to suppress, [Doc. No. 14] be **DENIED** in its entirety.[6]

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[6] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).